FTB:LZ/SMS
F. #2025R00484

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      - against -

ANGELA AQUINO,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**C O M P L A I N T**

Cr. No. <u>26 MJ 93</u>
(18 U.S.C. §§ 1343, 1349)

EASTERN DISTRICT OF NEW YORK, SS:

      CORY O'DONOHUE, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

      1.      In or about and between January 2025 and May 2025, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ANGELA AQUINO, together with others, did knowingly and intentionally devise a scheme and artifice to defraud the New York City Campaign Finance Board ("CFB") and to obtain money and property from the CFB by means of one or more materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, did transmit and cause to be transmitted, by means of wire communications in interstate commerce, one or more writings, signs, signals, pictures, and sounds, to wit: email communications and electronic transmissions.

      (Title 18, United States Code, Sections 1343 and 1349)

The source of your deponent's information and the grounds for his belief are as follows:[1]

2.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been involved in numerous public corruption investigations, including investigations concerning candidates seeking public office.   I have experience conducting investigations into public corruption and fraud schemes, including those involving bank fraud, mail fraud, wire fraud and identity theft.   I am currently assigned to a squad that focuses on public corruption, including white collar crimes.   My current duties involve investigating various violations of the criminal laws of the United States; making arrests; collecting and reviewing evidence in criminal investigations; and performing other duties imposed by law.   I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; and from reports of other law enforcement officers involved in the investigation.

I.    Relevant Individuals and Entities

3.    The defendant ANGELA AQUINO is a resident of New York, New York. AQUINO, who is originally from the Philippines, is a naturalized United States citizen.   During the 2025 election cycle, AQUINO campaigned as a candidate for New York City Public Advocate, a citywide position.   AQUINO had a personal bank account at "Bank 1," the identity of which is known to the affiant (the "AQUINO Account").

4.    The CFB is a nonpartisan, independent city agency, which administers New York City's campaign finance system, including its Matching Funds Program.

---

[1]    Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

5.    "Angela F. Aquino Angela for NYC" (the "Committee") was the defendant ANGELA AQUINO's campaign committee, which was registered as a participant with the CFB on April 15, 2024.   At times relevant to this complaint, AQUINO served as the treasurer of the Committee.   The Committee had a bank account at Bank 1 (the "Committee Account").

II.    New York City Public Campaign Finance Program

6.    The CFB offers a voluntary public-financing program matching small-dollar contributions from New York City residents to candidates for city office.   The program is available to any candidate running for city office, including Public Advocate.   To be eligible for matching funds, candidates must meet a two-part fundraising threshold: first, they must collect a minimum number of contributions of $10 or more; and second, they must raise a minimum amount of qualifying contributions from residents of New York City.   They also must meet other eligibility requirements unrelated to fundraising, such as filing a financial disclosure with the New York City Conflicts of Interest Board.   To be eligible for the matching funds program, a candidate for Public Advocate specifically must have raised at least $125,000 from at least 500 qualifying contributors.   In addition, for cash contributions only the first $100 per contributor was eligible for purposes of qualifying for matching funds.

7.    For a candidate to apply cash contributions toward the threshold necessary to become eligible for public matching funds, a candidate's authorized committee was required to submit contribution cards to the CFB that listed, among other information, each contributor's name, residential address, employer, occupation, and date and amount of contribution.   The contribution cards also had to be signed by the contributors.

8.    Candidates were prohibited from giving false information to the CFB, using public matching funds to make fraudulent campaign expenditures, or using campaign funds for purposes that were not qualified campaign expenditures.   In particular, candidates were prohibited from using public matching funds for purposes that were illegal, improper, or not in furtherance of the candidate's nomination or election.   Violation of these prohibitions would render the candidate ineligible to receive public matching funds.

9.    Once a candidate met the eligibility requirements to join the program, the CFB would provide the campaign with public funds at a matching rate of $8 to $1.   In other words, if a candidate raised $125,000 toward the fundraising threshold, the CFB would provide that candidate with $1 million in public matching funds.

## III.    The Defendant's Fraudulent Scheme

10.    As described below, the defendant ANGELA AQUINO engaged in a scheme to obtain $1 million in public matching funds from the CFB to which the Committee was not entitled.   In attempting to obtain such funds, AQUINO, together with others, falsely represented that cash deposited into the Committee Account in February, March and April 2025 constituted eligible contributions from residents of New York City.   In fact, nearly all of the cash deposited into the Committee Account during that period originated from AQUINO herself. AQUINO also falsely represented, together with others, that certain expenditures from the Committee Account were campaign-related, when in fact the withdrawn funds were recycled back into the Committee Account to inflate artificially the apparent total in contributions to the Committee Account.   In addition, some expenditures from the Committee Account were used to pay for personal expenses, such as rent for AQUINO's personal domicile, in violation of CFB rules.

11.     As early as July 2024, the defendant ANGELA AQUINO understood that in order to obtain public matching funds, she would have to raise $125,000 from at least 500 New York City residents.   She further understood that where a contribution was made in cash, only the first $100 of the contribution would be eligible for matching funds.

12.     The CFB publishes candidate fundraising and expenditure data on its website. According to the CFB's website, the defendant ANGELA AQUINO's campaign raised $135,288.21, exceeding the threshold of $125,000 to secure public matching funds. AQUINO's campaign reported receiving contributions from 1,658 discrete contributors, exceeding the threshold of 500 contributors. The campaign reported that $129,305 of the contributions was raised in cash, amounting to approximately 96% of the total amount raised.

13.     Despite understanding the CFB's requirements for eligible matching funds, AQUINO agreed with an individual located in the Philippines, whose identity is known to me ("Individual 1"), to borrow approximately $34,000.   AQUINO planned to transfer these funds to the Committee Account to inflate artificially the total contributions in the Committee Account such that the contributions would appear to meet the CFB's fundraising threshold for public matching funds.   In furtherance of that plan, on or about January 27, 2025, AQUINO sent a text message to Individual 1, writing, "im pretty confident that we will hit the threshold by April but we do need to get it started soonest to make sure that the money is injected and converted to contribution."   AQUINO offered to pay the money back "through issuing invoice of consultation. . . . Then do the wire transfer."

14.     The defendant ANGELA AQUINO provided Individual 1 with account information for the AQUINO Account on or about January 31, 2025.   Between February 3, 2025, and March 28, 2025, the AQUINO Account received more than $130,000 that originated

in the Philippines.   Of this amount, $37,867 was transferred by an entity associated with Individual 1.   AQUINO withdrew cash from the AQUINO Account and deposited the cash into the Campaign Account as putative cash contributions eligible for public matching funds. AQUINO subsequently withdrew $40,000 from the Campaign Account between March 12, 2025 and March 27, 2025, earmarking the withdrawals as campaign consulting fees related, variously, to social media, marketing and branding.   AQUINO transferred the $40,000 back to an entity in the Philippines that shared an address with the entity that originated the funds.

15.    By way of just one example, on or about March 12, 2025, the defendant ANGELA AQUINO received into the AQUINO Account approximately $53,400 originating from the Philippines.   On or about the same day, AQUINO withdrew approximately $23,000 in cash from the AQUINO Account and, also on March 12, 2025, $21,800 in cash was deposited into the Committee Account in two transactions.   Also on the same day, $10,000 was transferred from the Committee Account back to an entity in the Philippines that shared an address with the source of the funds.   This expenditure was described as being for campaign consultants, related to a social-media agreement.   In fact, the money was transferred from the campaign account to repay AQUINO's debt to Individual 1.

16.    The defendant ANGELA AQUINO also enlisted and attempted to enlist her friends and associates to receive checks from the Committee Account, to cash those checks, and to give AQUINO the cash so that she could deposit it back into the Committee Account. The purpose of recycling campaign funds in this way was artificially to inflate the contributions in the Campaign Account and to obscure the true source of the funds and AQUINO's involvement.

17.    For example, on or about March 13, 2025, the defendant ANGELA AQUINO wrote two checks from the Committee Account to entities owned by an individual whose identity is known to me ("Individual 2") as well as a third check to Individual 2 in Individual 2's own name.   The checks totaled approximately $23,500.   AQUINO accompanied Individual 2 to a bank, where she/he deposited the checks and withdrew $11,000 in cash. Individual 2 then gave AQUINO approximately $7,000 dollars in cash.

18.    On or about the same date, March 13, 2025, the defendant ANGELA AQUINO gave another individual whose identity is known to me ("Individual 3") a check for approximately $4,000 from the Committee Account.   AQUINO instructed Individual 3 to cash the check and immediately withdraw $4,000 in cash.   AQUINO instructed Individual 3 to give her the cash, which Individual 3 did, all while AQUINO accompanied Individual 3 at the bank. The same day, March 13, 2025, AQUINO deposited $11,010 into the Committee Account, which deposit included funds from both Individual 2 and Individual 3.

19.    The defendant ANGELA AQUINO also tried to persuade other associates to cash campaign checks and give her the cash.   For example, on or about March 12, 2025, AQUINO sent a text message to an individual whose identity is known to me ("Individual 4"), as follows: "So I have a different favor to Ask coz it's deadline tomorw then I get a million dollars for the campaign can u call me pls."   Based on my training and experience and discussions with witnesses, I believe that in this message AQUINO was explaining that she believed she had a CFB deadline of March 13, 2025, to meet the fundraising threshold in order to secure matching funds ("coz it's deadline tomorrow") and that, if she met the threshold, she would be given public matching funds in the amount of $8 for every $1 raised ("then I get a million dollars").

20.     To further conceal the scheme and to perpetuate the façade that she had met the fundraising threshold and was eligible for public matching funds, the defendant ANGELA AQUINO, together with others, lied to the CFB about the true source of the contributions to the Committee Account.   AQUINO coordinated with Individual 2 to ensure Individual 2's explanation aligned with hers, texting Individual 2 on March 14, 2026, "I'm just figuring out how we can work together need to carve up explanations etc about our expenditures not rush . . . ."   AQUINO also fabricated legitimate purposes for the churning expenditures and falsely reported them to the CFB.   For example, she described her payments to Individual 2 and Individual 2's two entities, variously, as office leasing, fundraising, and money for campaign workers.

21.     To perpetrate the scheme, hundreds of cash contribution cards were submitted to CFB to document the influx of cash into the Committee Account.   Many of these contribution cards were fraudulent.   For example, the Committee submitted a cash contribution card for a putative campaign contributor whose identity is known to me ("Contributor 1") and who lives in Brooklyn, New York.   The contribution card indicates that Contributor 1 made a contribution of $100 to AQUINO's campaign on March 10, 2025.   AQUINO attached this contribution card to an email and sent it to an associate on or about March 12, 2025.   The contribution card was submitted to the CFB electronically on March 17, 2025.   While the contribution card correctly reported Contributor 1's name, phone number, email, and address, Contributor 1 advised federal agents in sum, substance, and relevant part that Contributor 1 had not made a donation to AQUINO's campaign and the signature on the contribution card was not his/her own.

22.    In still other instances, the defendant ANGELA AQUINO converted campaign funds to personal use and lied to the CFB about the true purpose of the expenditures. For example, when AQUINO made payments from the Committee Account to two individuals whose identities are known to the affiant ("Individual 5" and "Individual 6"), she described the payments, falsely, as for office expenses and money for campaign workers.   AQUINO was interviewed by law enforcement agents on November 20, 2025.   During that interview, AQUINO falsely stated that Individual 5 and Individual 6 had provided assistance to the campaign by helping with petitions and helping with campaigning.

23.    Law enforcement agents interviewed Individual 5 and Individual 6 on April 22, 2026.   Individual 5 and Individual 6 reported that they had no involvement in AQUINO's campaign for public office.   They further stated that they had been subletting their apartment to AQUINO for approximately ten years, and that AQUINO lived there and paid both of them rent on a monthly basis.

24.    In another instance on or about March 10, 2025, the defendant ANGELA AQUINO issued a check from the Committee Account to an associate whose identity is known to me ("Individual 7").   The check was used to purchase wholesale dresses that AQUINO planned to resell at her clothing boutique.   To the CFB, however, the payment was described, falsely, as a "fundraising expense."

25.    While the defendant ANGELA AQUINO engaged in numerous fraudulent efforts to obtain matching funds from the CFB, AQUINO did not intend to use the matching funds, at least in large part, for a proper, campaign-related purpose.   Instead, communications and documents obtained through the investigation show that AQUINO planned to use the matching funds, variously, to invest in a movie she wanted to make ("he can help get seed

money from entertainment that we can multiply to 8 through campaign And re use again production"), to repay a loan ("Give me an idea of what is your ideal set up of time line of some of the money returned and it amount.   I will pay it through issuing invoice of consultation. . ."), and to meet the threshold for public matching funds for subsequent campaigns ("30% from matching funds shall be used for the contributions for the next matching funds").

26.    Despite the defendant ANGELA AQUINO's efforts, the CFB did not provide public matching funds to the Committee.   As described above, AQUINO, together with others, falsely represented that cash deposited into the Committee Account in February, March and April 2025 constituted eligible contributions from residents of New York City.   In particular, in a submission to the CFB on March 17, 2025, the Committee identified $127,070 in contributions as eligible for matching funds.   After reviewing the submission, the CFB issued a letter to AQUINO indicating that numerous of these claims for public matching funds had preliminarily been determined to be invalid.   Following the CFB's denial of its claims, the Committee ultimately withdrew a substantial number of its claims of eligibility for matching funds.

WHEREFORE, your deponent respectfully requests that the defendant ANGELA AQUINO, be dealt with according to law.

*Cory O'Donohue*

CORY O'DONOHUE
Special Agent, Federal Bureau of Investigation

Sworn to before me this
12th day of May, 2026  by telephone

THE HONORABLE CLAY H. KAMINSKY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK